IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JAYSON ANDREW TINDALL-MARTIN,

        Petitioner,

   v.

ERIN REYES,

        Respondent.

Case No. 2:23-cv-01566-AN

OPINION AND ORDER

Kara Anne Sagi
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

      Attorney for Petitioner

Dan Rayfield, Attorney General
Nick M. Kallstrom, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

      Attorneys for Respondent

1 – OPINION AND ORDER

NELSON, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his Linn County convictions dated May 9, 2012. For the reasons that follow, the Amended Petition for Writ of Habeas Corpus (#22) is denied.

## BACKGROUND

In 2012, the State charged Petitioner with sexually assaulting six women. This resulted in 20 charges across two cases. Specifically, in case number 10122061, the Linn County Grand Jury indicted him on two counts of Sexual Abuse in the First Degree (Michele Foltz), (Counts 1 and 2); two counts of Sexual Abuse in the Third Degree (Michele Foltz) (Counts 3 and 4); two counts of Sexual Abuse in the Third Degree (Alexis Lantis) (Counts 5 and 6); and two counts of Harassment (Alexis Lantis) (Counts 7 and 8). Respondent's Exhibit 102

In case number 11071269, the Linn County Grand Jury indicted Petitioner on one count of Sodomy in the First Degree (Shawnea Crowl) (Count 1); three counts of Rape in the First Degree (Shawnea Crowl) (Counts 2, 3 and 4); two counts of Sexual Abuse in the First Degree (Christa Decker) (Counts 5 and 6); one count of Unlawful Sexual Penetration in the First Degree (Christa Decker) (Count 7); one count of Sexual Abuse in the First Degree (Corinne Moilne), (Count 8); one count of Unlawful Sexual Penetration in the First Degree (Corinne Moilne) (Count 9); one count of Sodomy in the First Degree (Ashley Lantis) (Count 10); one count of Sexual Abuse in the Second Degree (Ashley Lantis) (Count 11); and one count of Rape in the First Degree (Ashley Lantis) (Count 12). Respondent's Exhibit 103.

Petitioner had been living in an apartment with a woman named Sarah Wooten. With the exception of Moilne, all complainants lived in Petitioner's apartment at one time or another. On January 14, 2008, Crowl became the first to report Petitioner for sexual assault. She had been 16

2 – OPINION AND ORDER

years of age at the time she moved into the apartment and, on January 14, 2008, she informed Officer Ken Fandrem, a school resource officer, that Petitioner had sexually assaulted her multiple times in February and March 2007. She brought Moilne with her because Moilne had previously informed her of an incident of sexual assault involving Petitioner, and Crowl wanted to give her the opportunity to make a disclosure regarding the incident.

According to Moilne, when she was a freshman in high school Petitioner saw her at a shopping mall and invited her to come sit with her in his car, a distinctive Chrysler New Yorker that his mother, Sharon Mogg, owned. Moilne knew Petitioner as an acquaintance because he had been a friend of her older brothers, and he had sometimes visited the family home. Moilne sat in Petitioner's car with him, and the two continued a conversation they had begun when they had been standing in the parking lot. According to Moilne, Petitioner asked her whether she was a virgin. When she responded that she was, Petitioner laughed and put his hand down her pants. Moilne pushed him away and attempted to leave, but Petitioner wrenched her arm back, put his hand back down her pants again, and this time penetrated her vagina. Moilne punched him, starting screaming, fled the car, and ran inside the mall.

At that time in her life, Moilne and Crowl were good friends who knew each other from school. Crowl worked at the mall, and Moilne ran to her and told her what had just transpired in the parking lot. Trial Transcript, pp. 574-81. The two discussed the incident, but Moilne did not tell her parents or want them to learn about what had happened because she "was in a very bad abusive relationship with [her] stepmother" and was afraid to for her to find out what had happened.[1] *Id.* at 581. Even after Moilne and Crowl disclosed their respective incidents of sexual

---

[1] After Moilne disclosed the incident involving Petitioner to Fandrem, Fandrem informed her parents of the allegations. According to Moilne, "[e]xactly what I was afraid would happen with my stepmother happened . . . I got blamed for it all and said that it was my fault. That I shouldn't

assault to Officer Fandrem, no further meaningful investigation took place. Crowl provided Fandrem with names of other people he should contact about this, but Fandrem did not contact any of them. *Id.* at 280. Fandrem sent the case "to the detectives" and he "also sent it to the District Attorney's office for review." *Id*. at 1109-10. According to Crowl, "nothing happened." *Id*. at 222.

In 2010, Alexis Landis and Amber Foltz reported to police that Petitioner had sexually assaulted them. Foltz also reported that her friend, Christa Decker, had related to her that Petitioner had sexually assaulted her in the past. Several months later, a detective spoke with Alexis's sister, Ashley, but Ashley did not identify herself as a victim at that time. It was not until June 2011, shortly after police had interviewed Wooten, Crowl, and Decker that Ashley Lantis reported that Petitioner had sexually assaulted her as well.[2]

Glenn Fairall, a detective with the Albany Police Department, initiated an investigation to determine if there were other victims, including Crowl and Moilne. He interviewed Moilne in January 2012, and she told him that Petitioner had twice forced his hands down the front of her pants while she sat with him in the New Yorker, penetrating her on the second occasion. That interview occurred four years after Officer Fandrem had interviewed her, and approximately five years after the assault had taken place. During the interview with Fairall, Moilne identified the

---

be getting in cars with boys that are nowhere near my age and that I did not know very well." Trial Transcript, p. 583.

[2] Wooten, too, had accused Petitioner of sexually assaulting her, and the State initially viewed her as a victim. Although it did not plan to bring charges against Petitioner based on his alleged misconduct with Wooten, it intended to call her as a witness at the trial involving the other six complainants. However, a defense investigator recorded a phone call in which Wooten had tried to coach another witness as to how to avoid being called by the defense as a witness. Respondent's Exhibit 137, p. 1. As a result, the State abandoned its plan to call Wooten as a witness.

incident as occurring during her freshman year that covered the fall of 2006 until the summer of 2007. Although she had reported to Officer Fandrem that the incident had occurred in April or May of 2007, she told Officer Fairall that she thought that the incident had taken place in November or December of 2006. Trial Transcript, p. 671.

At trial, the defense took the position that the complainants knew each other and had concocted false charges against Petitioner for various self-serving reasons:

- Petitioner had cheated on Ashley Lantis, was in a custody dispute with her, had mistreated her sister Alexis, and her family did not like him.

- He had cheated on Crowl, told her he would leave Wooten for her but never did, and was in a disagreement with her over damage done to his apartment.

- Petitioner and Decker had various disagreements causing him to rescind her status as godmother to his child with Wooten, and Petitioner believed she harbored animosity against him for mistreating Wooten.

- He believed Foltz did not welcome his flirtatious behavior, was of the opinion that she had romantic feelings for a woman upon whom he had cheated and with whom he had fathered a child, and also thought Foltz did not like his treatment of Decker.

- Petitioner also believed that Alexis Lantis had reason to collude with the others because he had cheated on and mistreated her sister, the Lantis family did not like him, and the last time she was at his home he had yelled and screamed at her sister.

- Finally, and most significantly in the context of this habeas case, Petitioner thought Moilne had motive to collude with the others because he had engaged in unwanted sexual flirtation with her, Crowl had been her good friend, and he mistreated Crowl by ending their relationship and kicking her out of his apartment in 2007.

When Moilne had first disclosed the alleged sexual assault to Officer Fandrem at Crowl's urging, she had placed the date of the incident as being in either April or May of 2007. However, when she testified at trial, her testimony was consistent what she told Officer Fairall four years after her interview with Fandrem, *i.e.*, that Petitioner had assaulted her in the New Yorker at the mall in November or December of 2006. Petitioner advised his trial attorney that the assault

5 – OPINION AND ORDER

Moilne described could not have taken place as she said because the New Yorker had not been operable during that time, and Petitioner testified to that effect at trial. *Id.* at 651. His mother, Sharon Mogg, not only told his attorney she could offer additional testimony that the car was inoperable during the time in question, but could also substantiate the testimony with documentation. Trial counsel did not, however, call Mogg to testify or attempt to submit any supporting documentation at trial.

In Case No. 10122061, the jury found Petitioner guilty of two counts of Sexual Abuse in the First Degree (Counts 1 and 2), one count of Sexual Abuse in the Third Degree (Count 6), two counts of Harassment (Counts 7 and 8). It found him not guilty of one count of Sexual Abuse in the Third Degree (Count 5). Respondent's Exhibit 101, pp. 16-21.

With respect to Case No. 11071269, the jury found Petitioner guilty of one count of Sodomy in the First Degree (Count 1), three counts of Rape in the First Degree (Counts 2, 3, and 4), one count of Sexual Abuse in the First Degree (Count 5), one count of Unlawful Sexual Penetration in the First Degree (Count 7), one count of Sexual Abuse in the Third Degree (a lesser included offense of Count 8), and one count of Unlawful Sexual Penetration in the First Degree (Count 9).[3] It found Petitioner not guilty of Counts 10, 11, and 12. Respondent's Exhibit 101, pp. 7-14. The trial court sentenced Petitioner to a total of 481 months in prison for all convictions stemming from both cases.

Petitioner took a direct appeal, and the Oregon Court of Appeals affirmed the trial court's decision in a *per curiam* opinion. *State v. Tindall-Martin*, 265 Or. App. 340 (2014). Petitioner sought further review in the Oregon Supreme Court, but Oregon's highest court denied review. 356 Or. 767 (2015).

---

[3] Counts 8 and 9 pertained to Moilne.

6 – OPINION AND ORDER

Petitioner next sought post-conviction relief ("PCR") in Umatilla County where, most relevant to this habeas corpus case, he alleged that his trial attorney had been ineffective for failing to establish that, during the time Petitioner was alleged to have sexually assaulted Moilne in the Chrysler New Yorker, the car had been inoperable. Respondent's Exhibit 114, p. 8. During the hearing, the judge asked Petitioner's PCR attorney whether a grant of relief on that claim would only affect the convictions pertaining to Moilne, or whether the grant of relief would affect Petitioner's other convictions as well. Respondent's Exhibit 136, pp. 31-32. Counsel responded that only the convictions involving Moilne would be affected. *Id.* at 32.

The PCR court granted relief on the ineffective assistance of counsel claim, concluding in part:

> Petitioner's Mother, Sharon Mogg, was at the trial and told Petitioner's attorney and his investigator that the car was not operable. She could have testified and provided documentation to that effect. Counsel did not follow up with the information or call Mogg as a witness. Even though Petitioner testified that the car was not functioning at the time Moilne alleged the sexual abuse occurred, the prosecutor did not try to rehabilitate her testimony to show that the assault may have occurred at another time. There is no evidence that the prosecutor would have done so if Ms. Mogg had been called to testify. The additional testimony of Mogg along with documentation of the status of the car would have bolstered Petitioner's testimony and would likely have affected the outcome of the trial with respect to the counts where Moilne was named as a victim.

Respondent's Exhibit 137, p. 3. The PCR court therefore vacated Petitioner's convictions on Counts 8 and 9 in Case No. 11071269 and remanded the case for further proceedings.

Petitioner appealed the decision, arguing in part that the PCR court erred when it limited its grant of relief only to Counts 8 and 9. He asserted that the PCR judge should have vacated all of his convictions from both criminal cases. He raised his claim as one of involving unpreserved

7 – OPINION AND ORDER

error, operating on the assumption that PCR counsel had expressly limited the claim during oral argument. Respondent's Exhibit 138, pp. 16-17. The Oregon Court of appeals affirmed the PCR court's decision without issuing a written opinion, and the Oregon Supreme Court denied review. *Tindall-Martin v. Amsberry,* 295 Or. App. 840, 435 P.3d 838, *rev. denied,* 365 Or. 195, 451 P.3d 2 (2019).

In September 2019, Petitioner filed a federal habeas corpus case in this Court, *Tindall v. Amsberry,* Case No. 2:19-cv-00441-SU, but voluntarily dismissed the case. Respondent's Exhibits 143-44.

On July 20, 2020, Petitioner filed a successive PCR action in Umatilla County raising issues not pertinent here. The PCR court ultimately denied relief on those claims. Respondent's Exhibit 152. The Oregon Court of Appeals affirmed the denial, and the Oregon Supreme Court denied review. Respondent's Exhibits 156, 158, 159.

While Petitioner's second PCR action was pending, in November 2020 the State retried him on Count 8 (the State dismissed Count 9 prior to the retrial). Moilne was unable to recall the specific month that Petitioner allegedly assaulted her, and stated that the alleged assault occurred sometime in 2006. Trial Transcript, pp. 1066, 1089-90. The defense called Officer Fandrem to impeach this recollection on the basis that she had informed him that the assault occurred in April or May of 2007, not 2006. *Id* at 1110. The defense also called Mogg to testify, and she was able to provide insurance documentation verifying that the New Yorker was inoperable during 2006. *Id.* at 1186-88. Mogg also contradicted Moilne's testimony about the New Yorker's front seating arrangement; Moilne had testified that it had bucket seats, but Mogg testified that her car had a bench seat. *Id.* at 1091-92, 1185-86. A jury eventually acquitted Petitioner as to Count 8,

8 – OPINION AND ORDER

and his remaining prison sentence after the dismissal of Counts 8 and 9 stood at 381 months. This reflected a 100-month reduction from his original sentence.

On October 26, 2023, Petitioner filed this 28 U.S.C. § 2254 habeas corpus case, and the Court appointed the Federal Public Defender to represent him in this matter. With the assistance of appointed counsel, Petitioner filed an Amended Petition (#22) on May 28, 2024. Although he raises four grounds for relief, he elects to proceed only on his Ground 2(A) claim. *See* Memo in Support (#45), p. 42   n. 24 (declining to proceed on remaining claims). In Ground 2(A), Petitioner once again raises the ineffective assistance of counsel claim upon which he already prevailed in his PCR case. He argues, however, that he was prejudiced as to all convictions, not just the counts that alleged crimes committed against Moilne.

Petitioner contends that his Ground 2(A) claim is procedurally defaulted, but he asks the Court to excuse his default due to attorney error in his PCR proceeding. He also asks the Court to review his claim using a *de novo* standard of review. Respondent contends Petitioner properly preserved Ground 2(A) for purposes of federal habeas review, asks the Court to apply the typical deference accorded to state court decisions, and also asks the Court to deny relief on the claim because it is unsupported by the record and lacks merit.

## DISCUSSION

I.    **Exhaustion and Procedural Default**

   A.    **General Principles**

A habeas petitioner must exhaust his claims by fairly presenting them to the state's highest court, either through a direct appeal or collateral proceedings, before a federal court will consider the merits of those claims. *Rose v. Lundy*, 455 U.S. 509, 519 (1982). "As a general rule, a petitioner satisfies the exhaustion requirement by fairly presenting the federal claim to the

appropriate state courts . . . in the manner required by the state courts, thereby 'afford[ing] the state courts a meaningful opportunity to consider allegations of legal error.'" *Casey v. Moore,* 386 F.3d 896, 915-916 (9th Cir. 2004) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, (1986)).

If a habeas litigant failed to present his claims to the state courts in a procedural context in which the merits of the claims were actually considered, the claims have not been fairly presented to the state courts and are therefore not eligible for federal habeas corpus review. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Castille v. Peoples*, 489 U.S. 346, 351 (1989). In this respect, a petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule, or failed to raise the claim at the state level at all. *Carpenter*, 529 U.S. 446, 451 (2000); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). If a petitioner has procedurally defaulted a claim in state court, a federal court will not review the claim unless the petitioner shows "cause and prejudice" for the failure to present the constitutional issue to the state court, or makes a colorable showing of actual innocence. *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Sawyer v. Whitley*, 505 U.S. 333, 337 (1992); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

///

### B.    The *Martinez* Exception

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court set forth the procedure whereby a habeas corpus litigant can show cause and prejudice to excuse a procedural default. It applies only in the context where a state, like Oregon, effectively requires claims of ineffective assistance of trial counsel to be litigated in a collateral proceeding. In the context of this case, in order to establish cause under *Martinez,* Petitioner must first show that his initial-level PCR attorney was ineffective under the standards the Supreme Court announced in *Strickland v.*

10 – OPINION AND ORDER

*Washington*, 466 U.S. 668 (1984) in failing to raise a claim of ineffective assistance of trial counsel claim. *Id* at 14. In order to do so, he must establish that his counsel's performance fell below an objective standard of reasonableness. *Strickland* 466 U.S. at 686-87. Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, Petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is generally whether Petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. In order to make the prejudice showing in the *Martinez* context, a habeas petitioner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez,* 566 U.S. at 14.

The contours of a "substantial" claim are not precisely defined, but the Supreme Court likens the standard to that of a certificate of appealability in a habeas corpus case. *Id.* In order to secure a certificate of appealability, habeas petitioners must generally show that reasonable jurists might find the outcome debatable, or that the issues are strong enough "to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003). On the other hand, a claim is considered "insubstantial" if "it does not have any merit or . . . is wholly without factual support." *Id* at 15. "Notably, the standard for evaluating the underlying trial counsel IAC claim during the *Martinez* prejudice analysis is not as stringent as that required when considering the merits of the underlying claim." *Leeds v. Russell,* 75 F.4th 1009, 1017 (9th Cir. 2023) (citing *Michaels v. Davis,* 51 F.4th 904, 930 (9th Cir. 2022). If a petitioner is able to

11 – OPINION AND ORDER

excuse a procedural default, the standard of review for the claim becomes *de novo*. *Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014).

### C.    Fair Presentation & Procedural Default Analysis

This case presents a somewhat unusual procedural posture insofar as Respondent argues that Petitioner fairly presented Ground 2(A) to Oregon's state courts, yet Petitioner argues that he failed to fairly present his claim in state court, leaving it procedurally defaulted. Petitioner contends that the Court should excuse his procedural default under *Martinez* because his PCR counsel was ineffective for failing to raise Ground 2(A) in his initial-level PCR proceeding. He then asks the Court to review his Ground 2(A) claim on its merits using a *de novo* standard of review rather than the demanding standard of review mandated by the Anti-terrorism and Effective Death Penalty Act ("AEDPA"). *See Harrington v. Richter*, 562 U.S. 86, 102 (2011) (AEDPA prescribes for relief in cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents[,]," and the Supreme Court recognizes that "[i]f this standard is difficult to meet, that is because it was meant to be.").

Procedural default in the habeas corpus context is an affirmative defense to be raised by a respondent. *Gray v. Netherland,* 518 U.S. 152, 165-66 (1996). In this case, Respondent generally raised the affirmative defense in her Answer to the Amended Petition when she asserted that Petitioner "procedurally defaulted on certain issues by his failure to pursue to completion all his available state remedies[.]" Answer (#33), p. 3. Importantly, she asserted her affirmative defense of procedural default specifically as to Ground 2(A) when she stated in her Response to the Amended Petition that it is "respondent's position that the Court of Appeals dismissed the [Ground 2(a)] claim on preservation grounds, which would render the claim procedurally

12 – OPINION AND ORDER

defaulted here." Response (#32), p. 19 n. 6.  Estoppel principles prevent Respondent from taking inconsistent positions between briefs in the same case. *See, e.g., New Hampshire v. Maine,* 532 U.S. 742, 749 (2001).

It was uncontroverted during Petitioner's PCR appeal that he was presenting an unpreserved claim for the Oregon Court of Appeals' review. Respondent's Exhibits 138-139. In this respect, the appellate court could only have reached the merits of the claim if it found that his claim consisted of "plain error." ORAP 5.45(1) provides a mechanism whereby the Oregon Court of Appeals can consider unpreserved errors of law which are "obvious" and "not reasonably in dispute." *Ailes v. Portland Meadows, Inc.*, 312 Or. 376, 381, 823 P.2d 956 (1991). Oregon law specifically requires an appellate court exercising its discretion to review an unpreserved claim as plain error to exercise the "utmost caution" in doing so and to "*expressly* follow[] the prescribed method of recognizing unpreserved or unraised error" by specifically describing why the assignment of error satisfies the "plain error" exception. *Id.* at 382 (italics in original).

In Petitioner's case, the Oregon Court of Appeals affirmed the PCR court's decision without issuing a written opinion. It therefore did not identify his Ground 2(A) claim as meeting the "plain error" exception as it was required to do under Oregon law had it found the claim to constitute plain error. It is therefore apparent that it did not consider the merits of his Ground 2(A) claim. Because Petitioner presented the claim to the Oregon Court of Appeals in a procedural context in which the merits were not considered, he failed to fairly present it and the claim is now procedurally defaulted.

///

///

13 – OPINION AND ORDER

D.        *Martinez* Analysis

Petitioner asks the Court to excuse his default pursuant to *Martinez*, alleging that counsel was ineffective for failing to raise his Ground 2(A) claim. However, PCR counsel did fundamentally raise the claim that Petitioner advocates in this proceeding. The Second Amended PCR Petition she filed on Petitioner's behalf faulted trial counsel for failing to investigate and obtain evidence that would have impeached Moilne's recollection that Petitioner sexually assaulted in the New Yorker in either November or December of 2006. Respondent's Exhibit 114, p. 8. In that pleading, Petitioner claimed that although trial counsel learned that the automobile had been wrecked and was not drivable at the time of the allegations, counsel did not seek out any verification of the car's status. *Id.* Although that was not the only claim he raised, his prayer for relief sought reversal and remand for a new trial on all counts, not just Counts 8 and 9. *Id.* at 11 (seeking "a judgment reversing his criminal convictions and remanding the underlying criminal proceedings to the Linn County Circuit Court for further proceedings; or, for such relief as is just and equitable under the circumstances of this proceeding."). He asked for identical relief in his Trial Memorandum. Respondent's Exhibit 115, p. 29.

However, when she argued the claim during the PCR hearing, PCR counsel faulted Petitioner's trial attorney for failing to take steps to highlight questions Petitioner raised as to "these charges, 8 and 9[.]" Respondent's Exhibit 136, p. 25. She argued that this was "a very serious charge, which ended up being [a] 100-month conviction with an additional 6-month conviction on the Sex Abuse III. But the Unlawful Sex Penetration I was [a] 100-month conviction, which ran consecutive, in addition carries a 20-year post-conviction . . . period of supervision." *Id.* at 27. It was when Petitioner finished presenting his evidence at the hearing that

the PCR judge asked counsel whether relief on the relevant claim would be limited to Counts 8 and 9:

> COURT:     I do have one question. The claim regarding the car and the testimony regarding the car, if I were to find on that claim, that would only affect those two counts, is that correct, Counts 8 and 9?
>
> COUNSEL:   That's correct.
>
> COURT:     It wouldn't have any impact on the other charges?
>
> COUNSEL:   That's correct.
>
> COURT:     Okay. Thank you.

Respondent's Exhibit 136, pp. 31-32.

Although PCR counsel agreed with the PCR Judge's characterization of the scope of relief, this in no way limited the PCR judge's ability to grant broader relief beyond Counts 8 and 9 given what had been pled.[4] PCR counsel identified the claim of ineffective assistance of trial counsel, clearly raised it in her pleadings, and sought reversal of all convictions within those proceedings. She alternatively asked the PCR court to grant any relief it found just and proper. To conclude that PCR counsel's performance fell below an objective standard of reasonableness under these facts would interpret *Martinez* to require attorneys to not only identify and raise substantial claims of ineffective assistance of counsel, but also meet minimum standards in terms of arguing the relief portion of the raised claim. *Martinez* does not go so far.

*Martinez*'s concern was limited to ensuring a convicted person could have a substantial claim of ineffective assistance of trial counsel addressed by at least one court, "whether it be the

---

[4] Indeed, the Oregon Supreme Court has concluded that a PCR court retains authority to grant relief even on a claim that is omitted from a PCR petition. *See Ogle v. Nooth*, 365 Or. 771, 787, 453 P.3d 1274, 1282 (2019) (omitting a claim from a PCR petition does not waive such a claim during that PCR action, it is only potentially unreviewable during a subsequent PCR action).

15 – OPINION AND ORDER

trial court, the appellate court on direct review, or the trial court in an initial review collateral proceeding." *Martinez,* 566 U.S. at 12. This was the reason the Supreme Court limited *Martinez*'s applicability to only claims of ineffective assistance of trial counsel claims in jurisdictions (like Oregon) that require such claims to be raised in a collateral proceeding. The Supreme Court focused on presentation of a claim, not the contours of argument, and opined that a prisoner needs an effective attorney "[t]o **present** a claim of ineffective assistance at trial in accordance with the State's procedures[.]" *Id.* at 12 (bold added). It reasoned that once the State decides to move trial-ineffectiveness claims outside of the direct appellate process as Oregon has, it "significantly diminishes prisoners' ability to **file** such claims." *Id.* at 13 (bold added).

Martinez speaks to the need to have an attorney sufficiently skilled enough to identify and present a substantial claim of attorney error so a PCR court can consider its merits. This is precisely what PCR counsel did in this case when she raised Petitioner's claim of attorney error pertaining to the non-operation of the New Yorker. The fact that she framed the claim at the PCR hearing as implicating only Counts 8 and 9 is not only reasonable given that those are the only convictions that involve Moilne, but could well be seen as a valid strategy to help ensure that her client obtained the relief that the judge appeared to be contemplating. Indeed, PCR counsel not only raised the claim, but successfully argued it and was able to obtain a 100-month sentence reduction for her client. The fact that Petitioner wished for additional relief beyond the Moilne counts does not mean that PCR counsel failed to raise or file a substantial claim of ineffective assistance of trial counsel for the PCR court's consideration as *Martinez* requires.

Even assuming *Martinez* required PCR counsel to not only raise a substantial claim of ineffective assistance of trial counsel for the PCR court's consideration, but also extends to how she argued for specific relief during the course of a hearing, counsel's performance did not fall

16 – OPINION AND ORDER

below an objective standard of reasonableness when she limited her oral argument to seeking relief only as to Counts 8 and 9. First, it is not knowable whether counsel might have jeopardized a grant of relief had she argued that the prejudice from counsel's error should negate all 13 of Petitioner's convictions. Only Counts 8 and 9 pertained to Moilne, and it was reasonable to argue them in this context.

These were also the only sexual assaults that were ever alleged to have occurred in the New Yorker, not just as to Moilne, but as to anyone. Consequently, whether the car was operable or inoperable on a certain date was germane only to Counts 8 and 9 involving Moilne. In this respect, the impeachment was factually unique to Moilne's allegations and irrelevant to the other 11 counts of conviction involving the five other complainants.

Even though Moilne's trial testimony was impeachable, it is significant that she reported to Officer Fandrem in January 2008 that the incident in the New Yorker had occurred in either April or May of 2007. Respondent's Exhibit 130, p. 97. That reflected a time period when the New Yorker was still operational. It was not until four additional years had passed, rendering the incident far more stale in her mind, that her recollection on timing changed. It was 2012 that she informed Officer Fairall that the assault in the New Yorker had occurred in her freshman year. She stated somewhat equivocally that she believed it had happened in either November or December of 2006, which turned out to be during a time when the New Yorker was not drivable. By the time of her interview with Detective Fairall, she had graduated high school, married, started a family, and moved to Portland. Trial Transcript, p. 583-84. The fact that her memory as to timing (but not as to content) had changed after four additional years elapsed would have been more suggestive to PCR counsel that the issue was date memory, not necessarily falsity, such

17 – OPINION AND ORDER

that it had no bearing on the other complainants' accounts. Obtaining a 100-month sentence reduction against this backdrop was effective advocacy.

Although Petitioner takes the position that Moilne fabricated the charges against him, she did not want to initiate disclosure at all. It was Crowl, not Moilne, who related to Officer Fandrem that Petitioner had assaulted Moilne. Trial Transcript, pp. 273-74, 707. Moilne did not want her family to know what had happened, and had instead reported the incident only to Crowl. She did so immediately following the alleged incident in the New Yorker, running screaming from Petitioner's car, straight into the mall, and directly to the store where Crowl worked. This, again, would have suggested to PCR counsel that Moilne's allegations might be credible but that, over the intervening years, Moilne had simply become confused about exactly when the assault had taken place during her freshman year of high school. Obtaining relief as to both counts involving Moilne would be an excellent result, whereas attempting to stretch the possibility of Moilne's faulty recollection on timing into a case-wide invalidation involving five other complainants could potentially risk obtaining no relief at all.

Perhaps most importantly, the notion that Moilne was part of a larger conspiracy to frame Petitioner is more speculation than substance. Petitioner argues that if his trial attorney had effectively established at the first trial that Moilne's alleged assault could not have occurred during the time period she referenced in her testimony, this would have cast substantial doubt on the testimony of the other complainants because they were so were so interconnected personally it might have established a scheme among the complainants to falsify charges against him. However, the only other complainant that Moilne knew was Crowl and, as Moilne testified at the first trial, the time of her testimony was "actually the first time [the two of them] had associated in about five years." *Id*. at 584. Moilne testified that she had not even heard about Petitioner

18 – OPINION AND ORDER

since her freshman year of high school. *Id.* The record does not support the inference that the she and Crowl maintained a secret friendship into adulthood in order to levy false charges against Petitioner.

Moreover, the counts pertaining to Crowl rested on evidence that was totally independent of that involving Moilne. Crowl's incidents occurred while she lived at Petitioner's apartment with Wooten and him, and they involved repeated sexual assaults that led to three convictions for Rape in the First Degree and one count of Sodomy in the First Degree. All of this contrasted with the single incident involving sexual touching in Petitioner's car that was at issue in Moilne's case. Consequently, impeaching Moilne by showing that an assault could not have occurred in 2006 of her freshman year was highly unlikely to affect how a jury viewed the other women's allegations.

PCR counsel made a wise strategic choice, and she did well for her client when she persuaded the PCR court to invalidate Petitioner's convictions on Counts 8 and 9, something that ultimately led to a significant reduction to his sentence. Her performance therefore did not fall below an objective standard of reasonableness. Even if one assumes that she should have asked the PCR court to invalidate all of his convictions, it was highly unlikely to do so because the only prejudice Petitioner suffered as a result of trial counsel's error pertained to Counts 8 and 9. He therefore cannot establish prejudice even under the assumption that counsel should have argued the case differently.

For all of the foregoing reasons, *Martinez* does not excuse Petitioner's procedural default as to Ground 2(A). For the same reasons, even if Ground 2(A) had properly been before this Court for a merits decision, and further assuming the standard of review was *de novo,* Petitioner would not be entitled to habeas corpus relief.

19 – OPINION AND ORDER

**CONCLUSION**

For the reasons identified above, the Amended Petition for Writ of Habeas Corpus (#22) is denied. The Court does, however, issue a Certificate of Appealability on these issues: (1) whether Petitioner actually procedurally defaulted his Ground 2(A) claim despite raising it in his PCR pleadings; (2) if so, whether *Martinez* excuses Petitioner's default under the facts of this case; and (3), if the default is excused, whether Petitioner's Ground 2(A) claim is meritorious such that habeas corpus relief is appropriate.

IT IS SO ORDERED.

7/13/26
DATE

Adrienne Nelson
United States District Judge

20 – OPINION AND ORDER